

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-26-1995

# Bundens v JE Brenneman Co

Precedential or Non-Precedential:

Docket 94-3163

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Bundens v JE Brenneman Co" (1995). *1995 Decisions.* Paper 23.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/23

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 94-3163 and 94-3175


BARBARA J. BUNDENS,
(widow of Howard E. Bundens),

                    Petitioner (No. 94-3163)

                         v.

J.E. BRENNEMAN COMPANY;
TRAVELERS INSURANCE COMPANY; and
DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
                    Respondents


J.E. BRENNEMAN COMPANY and
TRAVELERS INSURANCE COMPANY,

                    Petitioners (No. 94-3175)

                         v.

BARBARA J. BUNDENS
(widow of Howard E. Bundens) and
DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR;
BENEFITS REVIEW BOARD,
                    Respondents



Petitions from Benefits Review Board
Nos. 0090-1 and 91-1242


Argued:  September 19, 1994
BEFORE:  Becker and Cowen, <u>Circuit</u> <u>Judges</u>
     and Pollak, <u>District</u> <u>Judge</u>*

(Filed:  January 26, 1995)

*Honorable Louis H. Pollak, United States District Judge for the
 Eastern District of Pennsylvania, sitting by designation.

Morris M. Shuster (argued)
Chimicles, Jacobsen & Tikellis
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA  19041

        Counsel for Barbara J. Bundens
        Widow of Howard E. Bundens
        Petitioner in No. 94-3163
        Respondent in No. 94-3175

Gabriel D. Cieri (argued)
Krusen, Evans & Byrne
6th & Walnut Streets
Curtis Center, Suite 1100
Philadelphia, PA  19106

        Counsel for J.E. Brenneman Company
        Petitioner in No. 94-3175
        Respondent in No. 94-3163

        Counsel for Travelers Insurance Company
        Petitioner in No. 94-3175
        Respondent in No. 94-3163


Allen H. Feldman
Deborah Greenfield (argued)
Joshua T. Gillelan, II
Nathaniel I. Spiller
United States Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Washington, D.C.  20210

        Counsel for Director, Office of
        Workers' Compensation Programs,
        United States Department of Labor
        Respondent in Nos. 94-3163 and 94-3175

**OPINION**

COWEN, Circuit Judge.

Claimants are the widow and son of a deceased diver and dockbuilder. They appeal the decision of the United States Department of Labor, Benefits Review Board ("Board"), which held that the decedent's employer was not required to pay benefits under the Longshore Harbor Workers Compensation Act, 33 U.S.C. § 901, et seq., ("LHWCA") due to statutory exemption and credit provisions which applied as a result of a court-approved settlement of their previous federal court litigation. The employer has filed a protective cross-appeal solely to preserve its right to have this court examine the employment status of the decedent in the event that we reverse the Board on the release and credit issues.

We will affirm the order of the Board that the decedent was a harbor worker, not a seaman. Although the Board concluded that the employer could receive a full credit under either § 903(e) or § 933(f), we hold that only when these two sections are applied together do they provide a credit to the employer where the apportionment of funds between prior settled claims is unknown. The Board concluded that the "written approval" requirement of § 933(g)(1) does not apply. We will affirm the order of the Board, however, on other grounds. Next, we will affirm its determination that the notice provision of § 933(g)(2) was satisfied by virtue of the employer's participation in the tort settlement. Finally, we will reverse the order of the Board that the claimants are not entitled to any benefits under the

LHWCA and remand this case for further proceedings consistent
with this opinion.

**I.**

A. Factual History

Howard Bundens ("decedent") was employed by J.E.
Brenneman Co. ("Brenneman") as a diver and dockbuilder on a
variety of marine construction jobs.  On August 29, 1978,
decedent had been assigned with other employees of Brenneman to
the Monsanto pier on the Delaware River to remove a damaged
mooring platform, known as a dolphin.  A tug boat towed
Brenneman's heavy-lifting derrick barge, the Conqueror, to the
Monsanto main pier where it picked up the decedent together with
the other members of the crew.  Before going down-river to the
area of the broken dolphin, the Conqueror attached an anchor
cable from its bow to the main pier.  The tug then towed the
barge some distance past the site of the broken dolphin.  At that
location, the Conqueror set an anchor off its stern.  The tug
next brought the Conqueror back near the site of the broken
dolphin and departed.  By pulling itself with its winches along
the cables at its bow and stern, the Conqueror was able to
maneuver along the pier to facilitate cutting and removal of the
damaged dolphin.

The decedent and other workers performed this work by
using torches to cut the steel H-beam supports underneath the

dolphin, while the Conqueror's 90-ton derrick supported the weight of the dolphin.  The workers did the cutting work from planks fastened to the beams under the dolphin and from float stages, which were floating wooden work platforms about forty feet long.  When the dolphin was cut free, the derrick lifted it onto the deck of the barge.

After this task was accomplished, the decedent walked back to the main pier via the shoreline.  Meanwhile, the crew made ready to move the Conqueror to a location at Monsanto's main pier where it was to be secured for the night.  The Conqueror maneuvered itself down-river to weigh its stern anchor and then pulled itself back up-river along its bow cable approximately 300 feet past the damaged pier to the main pier.  Once the Conqueror arrived at the site at the main pier where Brenneman intended to moor her overnight, several lines were heaved to the decedent and another worker on the pier, and the anchor cable at the bow was unfastened.

A strong wind caused the bow of the Conqueror to "hang up" behind a piling at the pier and, simultaneously, the stern pitched out into the river.  Decedent went on board the Conqueror to help pull the aft end of the barge closer to the pier. Several workers, including the decedent, rigged an additional mooring line from a point on the pier, around and through various points at the stern of the barge, and along the starboard side. The line continued through a fair lead block, also known as the main snatch block (which was affixed to the deck), and then onto a winch drum or spool.  Once the line was through this last fair

lead block, the decedent took the end of the line and wrapped it several times around the spool.  Due to the tension on the mooring line created by the spool, without warning the fair lead block broke.  The decedent was killed almost instantly when he was struck by either a piece of the broken fair lead block or the ruptured line.[1]

## B. Procedural History

Barbara Bundens ("Bundens"), on behalf of herself, her minor son, Gregory Bundens, and her deceased husband's estate, filed a tort action in the United States District Court for the Eastern District of Pennsylvania on March 13, 1979.[2]  The next day, Bundens filed a claim for death benefits on behalf of herself and her son under the LHWCA.  Bundens contacted the Deputy Commissioner of the Office of Workers' Compensation Programs to request that the LHWCA claim be held in abeyance pending the termination of the federal court action.  In the federal court action, Bundens asserted claims against Brenneman both under the Jones Act and as the vessel owner for negligence under 33 U.S.C. § 905(b) of the LHWCA.[3]  When Brenneman joined

---

[1].  When the decedent was struck, his right arm was amputated and he received lacerations of the liver, diaphragm, and one of his lungs.  App. at 25.

[2].  All references to "Bundens" will be understood to include her son, Gregory, unless it becomes necessary to make a distinction, in which case we will refer to Barbara Bundens as "Barbara" and to Gregory Bundens as "Gregory."

[3].  The complaint stated as follows:  "Plaintiff brings this action pursuant to the general maritime law of the United States

(..continued)
and/or the Jones Act, 46 U.S.C. § 688 . . . ." App. at 26.
Brenneman argues in its answering brief (and at oral argument)
that a § 905(b) claim was never asserted in the complaint and
that they have been unable to determine if an amended complaint
was filed which set forth such a claim. Brenneman's answering
brief at 14 n.3. Bundens argues that although § 905(b) was never
asserted as such in the complaint, throughout the federal court
litigation, she maintained that Brenneman was liable for
negligence pursuant to § 905(b). In fact, the district court
judge who signed the order, App. at 84a, settling the federal
tort suit referenced and approved Bundens' Motion for Approval of
Settlement which stated:

> Plaintiff's alternative claims against
> Brenneman were that the decedent was a seaman
> and that Brenneman, as vessel owner, had
> breached its warranty of seaworthiness or if
> the decedent was not a seaman, <u>Brenneman as
> vessel owner, was liable because of its
> negligence pursuant to 33 U.S.C. § 905(b)</u>.

App. at 87a (emphasis added).

We are unable to find anywhere in the district court
record an objection by Brenneman that the complaint did not set
forth a § 905(b) claim. Additionally, there is no indication
that Brenneman, at the time the settlement was approved, objected
to Bundens' characterization of the federal court litigation as
including a § 905(b) claim. Furthermore, as stated above, this
characterization of the federal court litigation was accepted by
the district judge.

Section 905(b) of the LHWCA states in relevant part:

> Negligence of Vessel. In the event of injury
> to a person covered under this chapter caused
> by the negligence of a vessel, then such
> person, or anyone otherwise entitled to
> recover damages by reason thereof, may bring
> an action against such vessel as a third
> party in accordance with the provisions of
> section 933 of this title, and the employer
> shall not be liable to the vessel for such
> damages directly or indirectly and any
> agreements or warranties to the contrary
> shall be void.

33 U.S.C. § 905(b) (1988).

The 1972 amendments to the LHWCA added § 905(b) which
provided that a longshore worker employed directly by the vessel
owner could file suit against his or her employer with certain

additional parties as third-party defendants, Bundens filed suits against these parties as direct defendants.[4]

Brenneman filed a motion for summary judgment on December 9, 1981, claiming that as a matter of law the decedent was not a seaman under the Jones Act. Bundens by cross-motion for summary judgment claimed that the decedent was either a seaman under the Jones Act or a harbor worker under the LHWCA. The district court denied both motions.

(..continued)
limited exceptions. The Supreme Court affirmed this dual capacity doctrine in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 528-32, 103 S. Ct. 2541, 2546-48 (1983), thus confirming that an employee can sue his employer as vessel owner.

In 1984, § 905(b) was amended to prohibit recovery by an employee against an employer for negligence if the employer is the owner of the vessel and the employee is engaged in shipbuilding, repairing, or breaking services. The amended provision, however, only applies to injuries sustained after September 28, 1984, approximately five years after the filing of the federal tort suit. Therefore, when the suit was initiated, Bundens, regardless of her husband's duties, was able to maintain a negligence action in federal court against Brenneman, who was owner of the barge.

[4]. Specifically, Bundens filed suit against the following companies: (1) Independent Lighterage Company ("Independent") -- the company that sold the barge, Conqueror, to Brenneman; (2) A. Moe & Company, Inc. ("A. Moe") -- the company that performed repair and testing services on the vessel; (3) Universal Technical Testing Laboratories, Inc. ("Universal") -- the company that performed tests and inspections of the blocks and associated gear of the vessel; (4) Merritt-Chapman & Scott Corporation ("Merritt") -- the builder of the barge; and (5) Raymond International Builders, Inc. and its parent company, Raymond International, Inc. (collectively "Raymond") -- the companies that later took control of the assets of the builder and sold the barge to Independent. She sued all five parties alleging negligence. Additionally, she sued Merritt and Raymond alleging strict products liability.

Extensive settlement negotiations ensued, after which Bundens and all defendants entered into a comprehensive settlement of the federal litigation. The settlement provided for: (1) a Release Agreement ("Release") between Bundens and Brenneman; (2) an Indemnity Agreement ("Indemnity") between the same parties; and (3) a Settlement Agreement and Mutual Release ("Settlement") among all of the co-defendants.

The Release provided that in exchange for one million dollars, Bundens released Brenneman (but not any compensation insurance carrier) from all tort claims arising out of and related to the death of the decedent. The Release was structured in such a way as to preserve Bundens' right to pursue the LHWCA claim for death benefits that had been filed earlier. The Release also preserved any factual or legal contentions that could be raised in the LHWCA proceedings, including a defense by the compensation carrier that its liability had been discharged by virtue of the federal court settlement.[5]

---

[5]. The Release stated in relevant part:

> It is specifically understood that the Releasor [Bundens] may pursue and prosecute a claim for compensation benefits under the [LHWCA] on behalf of herself and Gregory Bundens, a minor, which claim Releasor represents has previously been filed. The parties hereto intend that this release shall be without prejudice to the factual and legal contentions which may be raised in any future compensation proceedings by Releasor and by Brenneman's compensation insurer or underwriter. Neither the execution and acceptance of this release, nor the payment and acceptance, nor the payment and acceptance of the consideration recited

The Indemnity was designed to ensure that Brenneman would not have to pay in excess of one million dollars as a consequence of decedent's death. Thus, in the event that Travelers Insurance Company ("Travelers"),[6] made a claim against Brenneman for reimbursement for any monies paid to Bundens as compensation benefits under the LHWCA, Bundens agreed to indemnify and hold Brenneman harmless from any liability, including counsel fees. The Indemnity anticipated that, if Travelers were to succeed in an action against Brenneman, the amount of benefits already paid to Bundens, combined with Brenneman's costs and counsel fees incurred in defending Travelers' indemnity claim, would not exceed $400,000. Accordingly, the Indemnity specified the sum of $400,000 to be

(..continued)

> herein, shall estop or be deemed to estop the Releasor, Brenneman, its insurers or underwriters or any entities or persons appearing on its behalf, from raising or proving any factual or legal contentions in such compensation proceedings, which they would otherwise be entitled to raise and prove. Nothing herein shall be construed as preventing the compensation carrier from defending the compensation claim on the basis that its liability is discharged because this Agreement constitutes settlement of a "third party claim", or as preventing the Releasor from contending that such defense is inapplicable.

App. at 93a-94a (emphasis added).

[6]. Travelers was Brenneman's compensation carrier under the LHWCA. However, as an owner and operator of vessels, Brenneman was insured by Continental Insurance Co. ("Continental"). The policy that Brenneman had with Continental insured Brenneman against claims by its employees under the Jones Act and general maritime law.

set aside out of the $1,000,000 paid to Bundens under the Release.

The Settlement executed among all of the defendants in the district court litigation dismissed with prejudice all of the Bundens' claims.[7] It also fixed the respective amount that each defendant would contribute to the $1,000,000 settlement established in the Release.[8]

---

[7]. Bundens was not a party to and did not sign this settlement agreement and mutual release, but she is referenced in the document as follows:

> WHEREAS, in consideration of the payment of One Million Dollars ($1,000,000.00) by negotiable instrument(s), in United States currency, receipt of which shall be acknowledged by Bundens for all those entitled to recover for the wrongful death of Howard E. Bundens, deceased, <u>Bundens has agreed to dismiss with prejudice all of the aforementioned lawsuits against Defendants</u> and has agreed to release and indemnify Brenneman as specifically set forth in the Release Agreement and Indemnity Agreement attached hereto as Exhibits "A" and "B", respectively, and incorporated herein by reference . . . .

App. at 63 (emphasis added).

As we understand the terms of the settlement, Bundens' approval of the settlement was conditioned on her receiving a total of $1,000,000 from any or all of the defendants. Likewise, Brenneman's approval of the settlement was conditioned on its paying no more than $861,600. Thus, as we will later explain, although Bundens signed a settlement agreement only with Brenneman, she necessarily settled the lawsuits with all of the other defendants at the same time. (NOTE: All monetary amounts in this opinion will be rounded to the nearest dollar.)

[8]. The $1,000,000 was to be funded by the defendants as follows:

| | | |
|---|---|---|
| a.) | Brenneman | $861,600 |
| b.) | Independent | $ 41,700 |
| c.) | A. Moe | $ 20,000 |

Although Travelers was invited to participate in the settlement negotiations, it declined.  After the settlement was reached on June 8, 1983, Travelers filed a motion to intervene in the federal court litigation with the intention of opposing the settlement as an attempt by Bundens to receive a double recovery. The motion to intervene was denied on the grounds that Travelers was not prejudiced by the settlement.

The district court approved the Settlement Agreement and the dismissal of the federal court tort litigation in July of 1983.[9]  Because the lawsuit was dismissed when the parties agreed upon a settlement, the district court never adjudicated whether the decedent was a seaman or a harbor worker.

After the case was settled, Bundens pursued her claim for compensation benefits under the LHWCA.  An evidentiary hearing was held before an Administrative Law Judge ("ALJ"), and in January of 1986, the ALJ issued a decision and order

(..continued)
|       |           |          |
|-------|-----------|----------|
| d.)   | Universal | $ 5,000  |
| e.)   | Raymond   | $ 41,700 |
| f.)   | Merritt   | $ 30,000 |

Pursuant to the Release, Brenneman was to pay the $1,000,000 to Bundens.  It was the responsibility of Brenneman to collect contribution from the other defendants.

[9]. In a later order, the district judge approved Bundens' attorneys' fees request for one-third of the recovery, and reimbursement for costs in the amount of $20,589.  The balance of the settlement funds ($646,078) was apportioned 70% to Barbara and 30% to the guardian of Gregory.  Thus, the net recoveries from the settlement were:

| Barbara Bundens | $452,255 |
| Gregory Bundens | $193,823 |

concluding that the decedent satisfied all three prongs of the Griffith test for crew member status and was therefore a seaman. Griffith requires that: (1) a worker have a more or less permanent connection with a vessel; (2) the vessel be in navigation; and (3) the worker must be on board primarily to aid in navigation. Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 36 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S. Ct. 785 (1976). The ALJ dismissed Bundens' claim for benefits after concluding that the decedent was expressly excluded from coverage under § 902(3) of the LHWCA because he was a seaman, not a harbor worker.[10]

On appeal to the Board, Bundens challenged the ALJ's determination that her husband was on board the barge Conqueror primarily to aid in navigation. The Board concluded that the ALJ's finding was neither supported by the record evidence nor applicable law. Accordingly, it reversed the ALJ's finding that the decedent was a seaman excluded from coverage under the LHWCA. The Board additionally noted that it did not need to reach Bundens' challenge to the ALJ's finding that the decedent had a

---

[10]. Section 902 of the LHWCA states in relevant part:

> When used in this chapter -- (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include -- (G) a master or member of a crew of any vessel.

33 U.S.C. § 902(3)(G) (1988).

permanent connection to a vessel, because the Board's holding nullified the ALJ's determination of seaman status on other grounds. It remanded the case for the ALJ to determine if Bundens was entitled to LHWCA benefits, and whether Brenneman was entitled to statutory credit under § 903(e) for its payment under the tort settlement agreement.[11]

On remand another ALJ found that Bundens was entitled to benefits under the LHWCA, and rejected Brenneman's argument that it was entitled to a credit under § 903(e). The ALJ reasoned that Brenneman would be entitled to § 903(e) credit only if the tort settlement disposed of the claims under the Jones Act, but not if it disposed of Bundens' § 905(b) claim under the LHWCA. The ALJ further noted that this issue was not decided in the federal litigation.[12] According to the ALJ, the settling

_____

[11]. Section 903(e) of the LHWCA states:

> Notwithstanding any other provision of law, any amounts paid to an employee for the same injury, disability, or death for which benefits are claimed under this chapter pursuant to any other workers' compensation law or section 688 of title 46, Appendix [the Jones Act] (relating to recovery for injury to or death of seamen) shall be credited against any liability imposed by this chapter.

33 U.S.C. § 903(e) (1988) (emphasis added).

[12]. Had there been a judicial determination of the decedent's employment status, the case before us would be quite different. If there had been an adjudication that the decedent was a seaman, then Bundens would be legally precluded from recovering compensation benefits under the LHWCA because only harbor workers can recover under the LHWCA. Conversely, if there had been a judicial determination that the decedent was a harbor worker, he would not have been entitled to recover under the Jones Act and

parties intended the nature of the settlement to depend on the decedent's status as a seaman under the Jones Act or as a harbor worker under the LHWCA, as later determined in the LHWCA proceeding. The ALJ concluded that Bundens was a harbor worker,[13] and that the tort settlement disposed of the claims under § 905(b) of the LHWCA, rather than under the Jones Act. He therefore concluded that Brenneman was <u>not</u> entitled to a credit under § 903(e).

In a supplemental petition for further consideration following denial upon reconsideration, Brenneman argued that the ALJ must revisit the issue of the decedent's employment status in light of recent Supreme Court precedent which eliminated the "aid in navigation" element of the seaman status test. <u>McDermott Int'l v. Wilander</u>, 498 U.S. 337, 353, 111 S. Ct. 807, 816 (1991). Since <u>Wilander</u> was decided after the decisions of the Board and ALJ, the Board could not have considered it when remanding the case. The order of the Board was erroneously premised on the view that because the evidence had not supported the finding of the first ALJ that the decedent did not aid in navigation, he could not be a seaman. On remand, the ALJ acknowledged that the "aid in navigation" element is no longer applicable, but that the

(..continued)
all of the money obtained from the federal tort settlement would be attributable to the § 905(b) negligence claim.

[13]. The ALJ made the following findings: (1) the decedent's duties included diving and dockbuilding; (2) the decedent's job on the date of his death was that of a wharf and dockbuilder; and (3) during the last three years of his employment, the decedent spent approximately one-third of his employment as a diver and two-thirds as a dockbuilder.

decedent was still a harbor worker because: (1) he engaged in traditional longshore (harbor worker) activities; and (2) the barge was not a "vessel in navigation" since at the time of decedent's death, it was simply being secured at the dock for the night. All parties concede that this latter finding by the ALJ was clearly error since Brenneman and Bundens had stipulated to the fact that the barge was a "vessel in navigation."

Brenneman appealed the decisions of the ALJ and also argued that Bundens' compensation claim was barred under § 933(g), because she had failed to obtain Travelers' written consent to the settlement.[14] After reviewing the factual

_____

[14]. Section 933(g) of the LHWCA states in relevant part:

> Compromise obtained by person entitled to compensation.
>
> (1) If the person entitled to compensation (or the person's representative) enters into a settlement with a third person referred to in subsection (a) of this section for an amount less than the compensation to which the person (or the person's representative) would be entitled under this chapter, the employer shall be liable for compensation as determined under subsection (f) of this section only if written approval of the settlement is obtained from the employer and the employer's carrier, before the settlement is executed, and by the person entitled to compensation (or the person's representative).
>
> (2) If no written approval of the settlement is obtained and filed as required by paragraph (1), or if the employee fails to notify the employer of any settlement obtained from or judgment rendered against a third person, all rights to compensation and medical benefits under this chapter shall be terminated, regardless of whether the

findings of the ALJ, the Board affirmed the determination of the ALJ that the decedent was a harbor worker and not a seaman, thus entitling Bundens to $335,754[15] in LHWCA benefits. The Board reasoned that the determination by the ALJ that the decedent was primarily a dockbuilder who performed construction, salvage, and repair work, was reasonable and supported by evidence in the record. The Board did not address the fact that the ALJ had erred by finding that the vessel was not "in navigation."

With respect to the § 903(e) credit issue, the Board agreed with Brenneman that the company was entitled to a credit for its net payment in settlement of the federal court litigation.[16] It reasoned that the settlement did not delineate how the settlement money was apportioned between the two claims. Therefore, the Board concluded that it was error for the ALJ to rely on the subsequent LHWCA proceedings to determine that

(..continued)
> employer or the employer's insurer has made
> payments or acknowledged entitlement to
> benefits under this chapter.

33 U.S.C. § 933(g) (1988) (emphasis added).

[15]. The $335,754 was allocated as follows:

| Barbara Bundens | $100,628 |
| Gregory Bundens | $232,205 |

We note that the above figures total $332,833 and not $335,754. We are uncertain why there is a difference of $2,921. However, because of our final disposition of this case, the discrepancy is irrelevant.

[16]. As mentioned previously, although the gross settlement was $1,000,000, after attorneys' fees and costs, the net settlement was $646,078.

Bundens was a harbor worker and then to attribute the settlement

exclusively to Bundens' § 905(b) claim.  The Board concluded that

since the record was unclear as to how the settlement amount was

to be apportioned between the Jones Act and the LHWCA claim,

Brenneman was entitled to offset the net amount of the settlement

against its liability under the LHWCA.

The Board held in the alternative that even if

Brenneman could not claim a credit under § 903(e), it would still

be entitled to a credit under § 933(f) which provides a credit

for an employer where a claimant recovers an amount in a suit

against a third party for which compensation is payable under the

LHWCA.[17]  The Board concluded that because Bundens had filed suit

and recovered against third parties, Brenneman was entitled to

offset the net amount of the third party recovery against its

---

[17]. Section 933(f) states:

> Institution of proceedings by person entitled
> to compensation.
>
> If the person entitled to compensation
> institutes proceedings within the period
> prescribed in subsection (b) of this section
> the employer shall be required to pay as
> compensation under this chapter a sum equal
> to the excess of the amount which the
> Secretary determines is payable on account of
> such injury or death over the net amount
> recovered against such third person.  Such
> net amount shall be equal to the actual
> amount recovered less the expenses reasonably
> incurred by such person in respect to such
> proceedings (including reasonable attorneys'
> fees).

33 U.S.C. § 933(f) (1988).

LHWCA liability.[18]  Thus, the Board modified the ALJ's decision to allow Brenneman a full credit for the net amount of the settlement.

The Board rejected Brenneman's defense under § 933(g)(1), concluding that this subsection only applies where the amount recovered from a settlement is less than the amount of compensation due.  It reasoned that Bundens received a net recovery of $646,078 from the federal court tort settlement, and would only be entitled to $335,754 under the LHWCA, an amount less than the net recovery from the one million dollar settlement.  Under these circumstances, the Board ruled that § 933(g)(2) applied, which required Bundens to provide Brenneman with notice of the settlement.  It found that this requirement was fulfilled here since Brenneman had been a party to the settlement agreement.

We have before us the appeal by Bundens of the decision of the Board which held that Brenneman was entitled to a credit pursuant to § 903(e) or § 933(f) of the LHWCA as a result of the court-approved settlement of Bundens' federal court litigation. Additionally, we have the cross-appeal by Brenneman challenging: (1) the Board's decision to affirm the ALJ's finding that the

---

[18].  In its discussion, the Board never specified whether Brenneman, the employer, was to be considered a "third person" for the purposes of § 933(f).  However, the Board did imply that the employer was a third person because the Board treated the entire net settlement recovery ($646,078) as a third party settlement, instead of looking only to money that was contributed by the defendants other than Brenneman.

decedent was a harbor worker; and (2) the Board's rejection of Brenneman's § 933(g) defense.

## II.

On review of an award of benefits under the LHWCA, the factual findings of an Administrative Law Judge are binding on the Benefits Review Board if they are rational, supported by substantial evidence on the record as a whole, and consistent with applicable law.  33 U.S.C. § 921(b)(3) (1988); Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs, 17 F.3d 616, 625-26 (3d Cir. 1994).  We review the Board's decision for the limited purpose of determining whether it committed an error of law.  A Board decision that sets aside findings of an ALJ that are supported by substantial evidence is legally erroneous.  Elliot Coal, 17 F.3d at 626.

### A.    Employment Status of the Decedent

Initially, we note that the test for ascertaining whether an employee is a member of a crew under the LHWCA is the same as that for determining seaman status under the Jones Act.  See Senko v. La Crosse Dredging Corp., 352 U.S. 370, 371, 77 S. Ct. 415, 416 (1957).  Thus, a conclusion that a worker is a seaman necessarily precludes recovery under the LHWCA.  Conversely, a determination that a worker is not a member of a crew permits recovery under the LHWCA.  See Wilander, 498 U.S. at 353, 111 S. Ct. at 817 ("We now recognize that the LHWCA is one of a pair of mutually exclusive remedial statutes that

distinguish between land-based and sea-based maritime employees."). The test to determine seaman status was identified in Griffith: (1) the vessel must be in navigation; (2) the worker must have a more or less permanent connection with the vessel; and (3) the worker must be aboard primarily to aid in navigation. 521 F.2d at 36. The Supreme Court later modified this test in Wilander, holding that, "the time has come to jettison the aid in navigation language." 498 U.S. at 353, 111 S. Ct. at 816. The Court reasoned that there was no indication in either the Jones Act or the LHWCA that Congress intended to exclude traditional seamen who do not aid in navigation. 498 U.S. at 354, 111 S. Ct at 817. Thus, the Court held in order to qualify for coverage under the Jones Act, the employee must: (1) have an "employment-related connection to a vessel in navigation"; and (2) "`contribut[e] to the function of the vessel or to the accomplishment of its mission.'" 498 U.S. at 355, 111 S. Ct. 817 (citing Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir. 1959). Stated differently, the second element does not require that "a seaman aid in navigation . . . of the vessel, but a seaman must be doing the ship's work." Id.

Because Wilander was not decided until 1991, that opinion was not considered by the second ALJ until raised by Brenneman in its supplemental petition following denial upon reconsideration. Brenneman argues that even after considering Wilander, the ALJ again erred by assuming that the barge Conqueror was not a vessel in navigation despite a stipulation by the parties to the contrary. We are called upon to determine

whether the Board properly affirmed the decision of the second ALJ regarding the status of the decedent as a harbor worker despite these factual and legal errors.

In the decision rendered on remand, the ALJ made findings of fact and concluded that the decedent was a harbor worker for the following reasons: (1) the decedent's duties included diving and dockbuilding; (2) the decedent's job on the date of his death was that of a wharf and dockbuilder; and (3) during the last three years of his employment, the decedent spent approximately one-third of his employment as a diver and two-thirds as a dockbuilder. In his Decision and Order Denying Supplemental Petition following reconsideration, the ALJ rejected Brenneman's argument that the decedent was a seaman by virtue of his performing the work of the barge Conqueror at the time of his death. The ALJ found that the decedent was engaged in the traditional longshore activity of repairing a dock or a pier at the time of his death, and that he was on the barge to accomplish a longshore function. The ALJ further concluded that although the decedent maintained some connection with vessels, and with the Conqueror in particular, his primary duties were related to construction work as a dockbuilder, and his diving activities did not constitute his predominant employment activities.

Although the ALJ erroneously concluded that the vessel was not in navigation, the ALJ's determination that the decedent was not a seaman was reasonable, supported by evidence in the record, and in accordance with controlling precedent. Prior to finding seaman status, Wilander mandates that the employee must

have an employment-related connection to a vessel in navigation and the employee's duties must contribute to the function of the vessel or the accomplishment of its mission. The factual finding of the ALJ that the decedent was engaged in traditional longshore activity may well have persuaded him that the decedent did not have an employment-related connection with a vessel sufficient to satisfy the first prong of the Wilander test.[19] Because at least one of the elements of the Wilander test was not satisfied, it was not improper for the ALJ to conclude that the decedent was a harbor worker, despite his erroneous conclusion that the vessel was not in navigation.

Additionally, despite the fact that the barge was in navigation, the Board found support for the ALJ's determination in its findings that: (1) he kept his diving equipment at home; (2) he commuted to work and received his diving assignments on

---

[19]. We in no way mean to suggest that a worker who engages in longshore activity may never be considered a seaman. Had we been sitting as the finder of fact in this matter, we may not necessarily have reached the same conclusion as the ALJ. As noted by the Supreme Court in Wilander:

> The inquiry into seaman status is of necessity fact-specific; it will depend on the nature of the vessel, and the employee's precise relation to it . . . . "[W]hether an individual was a `seaman' . . . depends largely on the facts of the particular case and the activity in which he was engaged at the time of injury."

498 U.S. at 356, 111 S. Ct. at 818 (citation omitted). However, due to our deferential standard of review, we hold that the conclusions of the ALJ as affirmed by the Board are rational, supported by substantial evidence, and consistent with applicable law.

shore; (3) he never ate or slept on the vessel; (4) his duties included diving and dockbuilding; (5) his job title on the date of his death was "wharf and dockbuilder;" (6) he was a member of the Wharf and Dockbuilders and Pile Drivers Union; (7) his dockbuilding duties remained the same whether he was working on land or on the barges; and (8) he spent approximately two-thirds of his time as a dockbuilder and only one-third as a diver during the last three years of his employment.[20]  In reviewing the decision of the Board, we conclude that it did not err in upholding the finding of the ALJ that the decedent was a harbor worker by virtue of his primary duties which related to construction work as a dockbuilder.

### B.  Applicability of § 903(e) and § 933(f)

The ALJ reasoned that the only way to ascertain if the § 903(e) exemption applied was to first determine if the settlement funds were paid to settle a Jones Act claim or a § 905(b) negligence claim under the LHWCA.  He determined that if the monies were paid to settle a Jones Act claim, then Brenneman would be entitled to statutory credit under § 903(e).  He further

---

[20].  In reaching its decision, the Board recited from the record several additional facts not found in the ALJ's prior decision. Admittedly, the Board conducted some "fact-gathering" of its own. We hesitate to refer to the Board's action as fact-finding, because the facts averred to in its opinion were stipulated to and, hence, undisputed.  However, without commenting on the propriety of the Board's action in "gathering" such facts, we simply note that the ALJ's findings of fact that the Board did refer to would be sufficient, by themselves, to uphold a determination that the decedent was a harbor worker.

concluded that if the monies were paid to settle a LHWCA negligence claim under § 905(b), then Brenneman would not be entitled to a credit under § 903(e). The ALJ assumed that since it was the intention of all the parties in the settlement agreement to allow Bundens to pursue her LHWCA claim, it was clear that the payment was not a settlement of the Jones Act claim. On appeal, the Board held that when the record is unclear as to how the settlement fund is apportioned among the various claims being settled, the employer is entitled to offset the net amount against its liability under the LHWCA. Bundens argues that the wording of the Release clearly indicated that no one intended to foreclose her rights to collect benefits under the LHWCA.[21]

Additionally, Bundens argues that since the § 903(e) credit is an affirmative defense, the burden of proof is not on her to prove that the settlement fund was allocated to the LHWCA claim, but rather it is the burden of Brenneman to show that the settlement monies were allocated to the Jones Act claim.[22]

---

[21]. See supra note 5.

[22]. Because of our discussion below, we need not address Bundens' argument concerning the allocation of the burden of proof in the context of § 903(e). However, we note that this issue has been addressed by other Courts of Appeals in analogous cases. For example, in Force v. Director, Office of Workers' Compensation Programs, 938 F.2d 981, 985 (9th Cir. 1991), the Court of Appeals for the Ninth Circuit held:

> LHWCA's "overall humanitarian policy" of
> compensating employees for their injuries
> requires that "all doubtful questions of fact
> be resolved in favor of the injured
> employee." Placing the burden of proof on

We believe the correct approach in addressing the credit issue is the view espoused by the Director of the Office of Workers' Compensation Programs ("Director"). The Director argues that it is unnecessary to determine how the settlement funds were apportioned between the Jones Act claim and the § 905(b) claim under the LHWCA because the combination of the credit and offset provisions of § 903(e) and § 933(f) would provide a full credit to the employer for amounts it actually paid.[23]

Before explaining how the combined application of § 903(e) and § 933(f) works to provide the employer with a credit for funds already paid in the tort settlement, we must first address Bundens' contention that § 933(f) does not apply in these proceedings. Bundens argues that § 933(f) was never properly

(..continued)
> employers is particularly appropriate in the
> context of [a credit provision] because the
> employer remains liable for the full amount
> of the statutory compensation absent a
> showing that the claimant has [already] been
> compensated by a third party.

(citation omitted). See also I.T.O. Corp. of Baltimore v. Sellman, 967 F.2d 971, 973 (4th Cir. 1992) ("We therefore conclude that it is both logical and consistent with the Act to impose the burden of proof [of apportionment] upon the employer."), cert. denied, __ U.S. __, 113 S. Ct. 1579 (1993). These cases, however, deal with the burden of proving the apportionment of funds between multiple parties, whereas here we are dealing with the apportionment of funds between multiple claims.

[23]. The Director argues that it is not only unnecessary to determine the apportionment of the settlement funds between the two claims asserted in the federal tort litigation, but that it is impossible to ever know how the settlement funds were apportioned.

raised by Brenneman in the proceedings before the ALJ or the Board and thus Brenneman has waived its right to assert § 933(f). Bundens thus contends it was error for the Board to raise this offset provision, sua sponte. We conclude that a § 933(f) defense was raised.

Initially, we observe that Brenneman explicitly raised a § 933(g) defense. Since § 933(f) governs the offset of third-party settlements in the event that the requirements of § 933(g) have been met, the Board's consideration of Brenneman's § 933(g)(1) defense fairly included consideration of § 933(f). Next, even Bundens concedes that "§ 933(g)(1) refers to the employer's compensation liability under 33 U.S.C. § 933(f)." Bundens' answering brief at 19. Additionally, we observe that in the settlement agreement signed by Bundens, the following language was present:

> Nothing herein shall be construed as preventing the compensation carrier from defending the compensation claim on the basis that its liability is discharged because this Agreement constitutes settlement of a "third party claim", or as preventing the Releasor from contending that such defense is inapplicable.

App. at 94a. While this language has no bearing on the credit issues that were actually raised by Brenneman in the LHWCA proceedings, we observe that the "third party claim" language explicitly refers to § 933(f). The combination of the fact that Brenneman actually raised § 933(g) with the explicit reservation of its right to raise the § 933(f) defense suffice to put Bundens

on notice.  We also note that the failure of Brenneman to exhaust its administrative remedies is not so troubling here because all of the findings necessary to apply § 933(f) are included in the findings for either § 903(e) or § 933(g).

Next, Bundens argues that even if § 933(f) has not been waived by Brenneman, this provision does not apply here because an employer cannot be a "third person" within the meaning of § 933(f).  The question before the Court is whether an employer who settles a negligence suit under § 905(b), when it is acting in its capacity as a vessel owner, is considered a third person under § 933(f).  We believe that the only meaningful interpretation of § 933(f) is to treat the employer as a third party whenever the employee recovers funds from the employer in other legal proceedings.  Section 933(f), as set forth above, indicates that an employer only has to pay compensation benefits to the "person entitled to compensation" ("PETC") when the amount of the benefits to which the PETC is entitled under the LHWCA exceeds the net amount of money that the PETC has recovered from a third party.  If the employer/vessel owner is a third party, then any monies paid by the employer in the negligence suit can be used to offset the monies owed the PETC under the LHWCA.  If the employer/vessel owner is not considered to be a third party under § 933(f), then the employer is prohibited from deducting monies already paid.

It seems clear that if an employer is able to offset his liability under the LHWCA with monies previously paid by others under a tort settlement, then there is even stronger

reason to allow the employer to offset monies paid in a tort settlement when the employer is the one who previously paid the monies. Under § 933(f), an employer who settles a tort suit as a vessel owner must be construed as a third party. To hold otherwise would create a perverse result: an employer would have to pay a double recovery simply because he is the owner of the vessel, whereas if another party is the owner of the vessel and the employee settles with that third party for a net sum which exceeds the amount to which he is entitled under the LHWCA, the employer would pay nothing. Thus, the net amount of $646,078 that the Bundens received for settling the suit can be said to be an amount recovered against a third person and can be used by Brenneman to offset its liability under the LHWCA.

After concluding that § 933(f) was properly raised and that its third person setoff provision applies to Brenneman as the employer/vessel owner, we now turn to the discussion of how §§ 903(e) and 933(f), taken together, allow Brenneman a credit for the net amount of its tort settlement. Section § 903(e) provides an employer with a credit for payments made under the Jones Act.[24] Section § 933(f) states that an employer is required to pay under the LHWCA only the difference between its

---

[24]. Although § 903(e) provides for an offset for "any amounts paid," presumably we should consider the net, and not the gross, funds recovered from a Jones Act suit. Otherwise, for example, a person entitled to $300,000 in compensation benefits under the LHWCA who receives a $301,000 gross recovery pursuant to the Jones Act would not be entitled to additional compensation despite a net recovery of only $200,667 (assuming a one-third deduction for attorneys' fees).

LHWCA liability and the net amount recovered by the employee in suits against third parties for damages. Whatever amount of the settlement is attributable to settlement of the Jones Act claim will be credited against Brenneman's LHWCA liability under § 903(e). Whatever amount of the settlement is attributable to settlement of the § 905(b) claim offsets Brenneman's liability in accordance with § 933(f). Thus, no matter how the parties could have apportioned the settlement between the claims under the Jones Act and under § 905(b), and no matter who bears the burden of proving apportionment,[25] Brenneman is entitled to a credit for the net settlement amount by virtue of the combined application of §§ 903(e) and 933(f).[26]

Notwithstanding the applicability of §§ 903(e) and 933(f), these provisions must be applied to Barbara and Gregory,

[25]. See supra note 22.

[26]. Remembering that the net settlement funds for the Bundens totalled $646,078 and assuming arguendo that the settlement funds were apportioned so that 50% of the money settled the Jones Act claim and 50% settled the § 905(b) claim, Brenneman would be entitled to a $323,039 credit under § 903(e) and a $323,039 credit under § 933(f). This would suffice to eliminate its $335,754 liability under the LHWCA. Assuming arguendo that the settlement was apportioned 90% and 10% with regard to the Jones Act and § 905(b) claim, respectively, Brenneman would be entitled to a $581,470 credit under § 903(e) and a $64,608 credit under § 933(f). This also would suffice to eliminate its $335,754 liability under the LHWCA. Conversely, if it was a 10% and 90% apportionment, the result would be the same. Finally, even assuming arguendo that the settlement was apportioned 100% and 0% with regard to the Jones Act and § 905(b) claim, respectively, Brenneman would be entitled to a $646,078 credit under § 903(e) and a $0 credit under § 933(f). Again, this would suffice to extinguish its $335,754 liability under the LHWCA. And, of course, if it was a 0% and 100% apportionment, the outcome would be identical.

separately, since Barbara and Gregory are both "PETC" under § 905(a) which lists separately "wife" and "dependents." In analyzing the tort award, we note that $1,000,000 was recovered and was to be divided 70% to Barbara and 30% to Gregory. After costs and attorneys' fees, the net amount awarded to Barbara and Gregory, respectively, was $452,255 and $193,823.

Under § 933(f), the employer is to pay a sum "equal to the excess of the amount which the Secretary determines is payable on account of such injury or death over the net amount recovered against such third person." 33 U.S.C. § 933(f) (emphasis added). Likewise, to the extent that the employer does not receive a credit under § 903(e), it is required to make up the deficiency. Under the LHWCA, Barbara and Gregory are entitled to $335,754 -- Barbara's share was $100,628 and Gregory's share was $232,205.

Thus, applying §§ 903(e) and 933(f) together to each of these separate claims, we note that Barbara received $452,255 from her tort settlement and would be entitled to $100,628 from the LHWCA. Since her recovery under the LHWCA does not exceed her net recovery from the third party suit, she is entitled to no additional funds under the LHWCA. Gregory, on the other hand, received $193,823 from the tort settlement and is entitled to $232,205 from the LHWCA. Since his recovery under the LHWCA exceeds his net recovery from the third party suit, he is

entitled to an additional $38,382 from Brenneman under the LHWCA, barring any termination of benefits under § 933(g)(2).[27]

## C.  Applicability of § 933(g)

Section 933(g)(1) applies to settlements with third persons where the settlement is for an amount less than the compensation to which the claimant would be entitled under the LHWCA.  It requires that the employee receive the written approval of the employer and the employer's carrier whenever the employee enters into a settlement for an amount less than the compensation that he or she is entitled to under the LHWCA.

The Board rejected Brenneman's defense under § 933(g)(1), concluding that this subsection only applies where the amount recovered from a settlement is less than the amount of compensation due.  It reasoned that Barbara and Gregory Bundens received a net recovery of $646,078 from the federal court tort settlement, and would only be entitled to $335,754 under the LHWCA, an amount less than the net recovery from the one million dollar settlement.

---

[27]. The fact that Gregory is still entitled to $38,382 from Brenneman does not contradict our earlier conclusion that Brenneman was entitled to claim a credit for the full amounts it paid to Barbara and Gregory irrespective of the apportionment of the settlement between the Jones Act and LHWCA claims.  Instead, the remaining liability to Gregory stems from the allocation of the settlement between Barbara and Gregory and the operation of that allocation in § 933(f).

The Director argues that the Board made two errors in applying § 933(g). First, the Board looked to the net settlement amount instead of the gross settlement amount when deciding whether Bundens had to obtain written approval of the settlement. Second, the Board treated the tort recovery of Barbara and Gregory as one settlement. Instead, it should have considered Barbara and Gregory separately since both are "persons entitled to compensation" under the LHWCA.

Comparing the language of § 933(f) to § 933(g), we observe that whereas § 933(f) specifically refers to the "net amount recovered against such third person" (and even defines it), § 933(g) refers simply to "a settlement . . . for an amount less than the compensation to which the person . . . would be entitled." Thus, although Congress demonstrated its ability to specify "net amount" when it wanted to, it failed to do so in subsection (g). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Immigration and Naturalization Service v. Cardoza Fonseca</u>, 480 U.S. 421, 432, 107 S. Ct. 1207, 1213 (1987) (citations omitted). Moreover, as the Supreme Court has stated, where "the plain meaning of th[e] statute appears to settle the question," a court should look to other sources "to determine only whether there is `clearly expressed legislative intention' contrary to the language, which would require [the court] to question the strong presumption that Congress expresses its

intent through the language it chooses." Id. at 432 n.12, 107 S. Ct. at 1213, n.12.

Additionally, the inclusion of "net" and its definition in § 933(f) was part of a comprehensive 1984 overhaul of § 933. During this revision, Congress rewrote four subsections, including § 933(g). Although § 933(g) was elaborately recast, Congress did not elect to include the "net" language that it carefully placed in § 933(f).

Given the opportunity to redraft the statute, we might well have included the "net" language in § 933(g).[28] However,

---

[28]. There are several compelling arguments for reading § 933(g) to mean "net."

First, as even the Director concedes, interpreting the term "settlement" as "gross settlement" will result in some cases where the employer owes a deficiency under § 933(f) without being given the opportunity to disapprove the settlement under § 933(g)(1). This could occur, for example, where the claimant is entitled to $500,000 in compensation benefits under the LHWCA and receives a $501,000 gross recovery ($334,000 net recovery, assuming a one-third deduction for attorneys' fees) from a third party settlement. Under the Director's approach, the claimant would not be required to obtain the employer's and the carrier's written approval pursuant to § 933(g)(1), but the employer would be liable under § 933(f) for the shortfall between the $500,000 and the $334,000. Thus, the employer would be required to pay $166,000 without first having had the option of disapproving the settlement.

Second, no one subsection of a statute should be read in isolation. Thus, there can be no meaningful interpretation of § 933(g) without also considering other sections and subsections in the statute. Although § 933(f) and § 933(g) are two separate subsections, they are meant to work in conjunction with one another. In fact, the very language of § 933(g) directs the reader back to § 933(f). Section 933(g) cannot be invoked and applied without also applying § 933(f). That is to say, every time § 933(g) is implicated, you must necessarily apply § 933(f).

Third, this interpretation of § 933(g) comports with the overall scheme of § 933(f) and § 933(g) of ensuring that: (1) a claimant who recovers under a third party action never receives less than the claimant would be entitled to under the LHWCA

because our task is to interpret, and not to create law, we are compelled to conclude that in applying § 933(g) the Board should consider the gross, and not the net, settlement funds.[29]

Applying § 933(g)(2) separately to Barbara and Gregory, we reach the following. Because the $700,000[30] gross settlement that Barbara received in the settlement exceeds the $100,628 that she would be entitled to under the LHWCA, she was not required under § 933(g)(1) to obtain the written approval of either the employer or the employer's carrier prior to the settlement. And since the $300,000 that Gregory received was more than the $232,205 that he would be entitled to under the LHWCA, he too was not required to obtain the written approval of the employer or the employer's compensation carrier.

Although written approval was not required under § 933(g)(1), the Board ruled that the § 933(g)(2) notice provision applied. The Board found that this requirement was fulfilled

(..continued)
simply because the gross settlement exceeds the LHWCA benefits; and (2) an employer's written approval be required in a settlement proceeding, so that the employer is not required to pay additional benefits under the LHWCA where the claimant was not aggressive in pursuing his or her third party claim.

[29]. In addition to the compelling statutory construction argument which prevails here, practical realities also militate against the "net" approach. As the Director points out, a claimant may not be able to calculate the net settlement before accepting it, and thus may not know whether he needs to obtain the employer's consent.

[30]. In supra notes 8-9 we stated that Barbara and Gregory recovered $1,000,000 in the settlement and it was apportioned 70% to Barbara and 30% to Gregory. Thus, Barbara's gross recovery was $700,000 and Gregory's gross recovery was $300,000.

here since Brenneman had been a party to the settlement agreement. We agree. Section 933(g)(2) requires that the employer receive notification of the third party settlement. Because Brenneman itself was a party to the third party settlement, the § 933(g)(2) notification requirement was clearly satisfied in this case.[31] See also Bethlehem Steel Corp. v. Mobley, 920 F.2d 558, 561 (9th Cir. 1990) ("So long as the employer has notice of the settlement before it has made any payments and before the Agency orders it to make any payments, the purposes of [§ 933(g)(2)] are satisfied.").

Although the Board erred in interpreting § 933(g)(1), it reached the correct result in deciding that § 933(g)(1) did not apply. Additionally, the Board did not err in holding that the notice provision of § 933(g)(2) was satisfied. Thus, we will affirm the order of the Board on this issue.

CONCLUSION

We will affirm the decision of the Board that: (1) the decedent was a harbor worker, not a seaman; (2) the "written approval" requirement of § 933(g)(1) does not apply, though we affirm on other grounds; and (3) the notice provision of § 933(g)(2) was satisfied by virtue of the employer's participation in the tort settlement. We will reverse the order of the Board

---

[31]. Additionally, as mentioned previously, Travelers was invited and declined to participate in the settlement negotiations. However, Travelers received notice of the settlement when copies of the Settlement and Release were sent to counsel for Travelers prior to the execution of these documents.

that § 903(e) alone, or alternatively § 933(f) alone, provides a credit for the employer.  We hold that only when § 903(e) and § 933(f) are combined does an employer receive a credit when the apportionment of funds between prior settled claims is unknown.  In sum, because the Board erred in applying and interpreting various provisions of the LHWCA, we will remand this matter to the Board to re-calculate the compensation benefits owed to Gregory.